1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JEROME THOMAS, II,                           No. C 05-1332 MHP (pr)

            Petitioner,                    **ORDER GRANTING HABEAS
PETITION**

      v.

JILL BROWN, warden,

            Respondent.

_____/

## INTRODUCTION

Jerome Thomas, a prisoner at San Quentin State Prison, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. After 20 years of incarceration on his 17-to-life sentence during which he has exhibited exemplary behavior, Thomas' crime does not provide some evidence to support the Governor's decision that he is currently unsuitable for parole. The petition will be granted.

## BACKGROUND

Jerome Thomas was convicted in 1982 in Alameda County Superior Court of second degree murder with use of a firearm. He was sentenced to a prison term of seventeen years to life, including a two-year enhancement for use of a firearm. His habeas petition does not concern that conviction directly, but instead focuses on a March 2003 decision by former Governor Gray Davis to reverse a February 21, 2003 decision by the Board of Prison Terms ("BPT") finding him suitable for parole.

1     The specifics regarding the crime and the circumstances regarding parole suitability
2  are described in the Discussion section later in this order and are only mentioned here in
3  brief.  Thomas shot and killed 53-year old Jessie Ross on October 6, 1979 after Ross made a
4  pass at Thomas' girlfriend.  They were at a party when Thomas learned that Ross had made
5  the pass; Thomas and Ross argued about it.  Thomas left the party with his girlfriend, but
6  returned to the party about 15 minutes later and shot Ross six times at close range.  He turned
7  himself in two days later.  He was convicted of second degree murder with use of a firearm
8  in 1982.  Other than the murder, his criminal history consists of a single misdemeanor
9  conviction four years before the murder.  Thomas has exhibited exemplary behavior during
10 his 20 years in state prison since the conviction and has good parole plans.  The BPT decided
11 Thomas was parole-suitable, but the BPT's decision was subject to review by the Governor.

12    Governor Davis identified several factors in support of his decision to reverse the BPT
13 panel's decision.  He determined that Thomas was not suitable for parole and would pose an
14 unreasonable risk of danger to society or a threat to public safety if he was released based on
15 the circumstances of the offense, Thomas' failure to accept responsibility for the crime, his
16 need for further programming for anger management and his pre-offense history.

17    Thomas sought relief in the California courts.  The Marin County Superior Court
18 denied his petition for writ of habeas corpus in 2003.  See Exh. AA to Resp. Exh. 8.  The
19 California Court of Appeal summarily denied his petition for writ of habeas corpus and the
20 California Supreme Court summarily denied his petition for review.

21    Thomas then filed his federal petition for writ of habeas corpus.  After an unsuccessful
22 motion to dismiss, respondent filed an answer.   Thomas filed a traverse.  The matter is now
23 ready for a decision on the merits.

24                              **JURISDICTION AND VENUE**

25    This court has subject matter jurisdiction over this habeas action for relief under 28
26 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged
27 action occurred at San Quentin State Prison in Marin County, California, within this judicial
28 district.  28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A.    Due Process Requires That Some Evidence Support A Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability  proceedings.  See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

1     A parole board's decision satisfies the requirements of due process if "some evidence"

2  supports the decision.  Sass, 461 F.3d at 1128-29 (adopting some evidence standard for

3  disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).

4  California law adds a layer of review by giving the governor the power to review the parole

5  board's decision and to affirm, modify or reverse the decision but only on the basis of the

6  same factors the parole authority is required to consider.  See Cal. Penal Code § 3041.2; Cal.

7  Const. art. V, § 8(b).  The California Supreme Court has determined, as a matter of state law,

8  that the governor's decision must also satisfy the "some evidence" standard.  See In re

9  Rosenkrantz, 29 Cal. 4th 616, 676-77 (Cal. 2002), cert. denied, 538 U.S. 980 (2003).

10 Because the governor's review is an extension of the parole consideration process and the

11 parole decision does not become final until such review has occurred (or the time for it has

12 passed), the governor's decision must be supported by some evidence.

13    "To determine whether the some evidence standard is met 'does not require

14 examination of the entire record, independent assessment of the credibility of witnesses, or

15 weighing of the evidence.  Instead, the relevant question is whether there is any evidence in

16 the record that could support the conclusion reached'" by the parole board or the governor.

17 Id. at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56).  The "some evidence

18 standard is minimal, and assures that 'the record is not so devoid of evidence that the findings

19 of the . . . board were without support or otherwise arbitrary.'"  Id. at 1129 (quoting

20 Superintendent v. Hill, 472 U.S. at 457).  The some evidence standard of Superintendent v.

21 Hill is clearly established law in the parole context for purposes of § 2254(d).  Sass, 461 F.3d

22 at 1129.

23    A critical issue in parole denial cases concerns the BPT's and governor's use of

24 evidence about the murder that led to the conviction.  Two cases provide the guideposts for

25 applying the Superintendent v. Hill some evidence standard on this point.  In Biggs v.

26 Terhune, 334 F.3d 910 (9th Cir. 2003), the court explained that the value of the criminal

27 offense fades over time as a predictor of parole suitability:  "The Parole Board's decision is

28 one of 'equity' and requires a careful balancing and assessment of the factors considered. . . .

4

A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. The recent decision of Sass criticized the Biggs statements as improper and beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability. See id. at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). The Sass and Biggs decisions are not polar opposites and can be harmonized: the BPT can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole (Sass), but the weight to be attributed to those immutable events decreases over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs). The one way in which Sass limits Biggs is to put to rest any idea that the commitment offense and pre-offense behavior only support the initial denial of parole. The immutable events may support the decision to deny parole not just at the first parole consideration hearing but also at subsequent hearings. However, Sass did not dispute the principle that, other things being equal, a murder committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago. Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison counts for something according to Biggs. Superintendent v. Hill's standard might be

quite low, but it does require that the decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies.  One must look to state law to answer the question, "'some evidence' of what?"

B.      <u>State Law Standards For Parole For Murderers In California</u>

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years.  A first degree murder conviction yields a base term of 25 years to life and a second degree murder conviction yields a base term of 15 years to life imprisonment.  <u>See</u> <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1078 (Cal.), <u>cert. denied</u>, 126 S. Ct. 92 (2005); Cal. Penal Code § 190.   The upshot of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPT panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates."  Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides:  "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A

parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[1]  The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a).  The panel may consider all relevant and reliable information available to it.  15 Cal. Code Regs. § 2402(b).  As noted earlier, the governor's review must be done on the basis of the same factors the parole authority is required to consider.  See Cal. Penal Code § 3041.2; Cal. Const. art. V, § 8(b).

The regulations contain a matrix of suggested base terms for several categories of crimes.  See 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime.   Some prisoners estimate their time to serve based only on the matrix.   However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires the prisoner first to be found suitable for parole.

The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.  Dannenberg, 34 Cal. 4th at 1070-71.  Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole").  The California Supreme Court's determination of state law in Dannenberg is binding in this federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

The California Supreme Court also has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable.  "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative

1  analysis before concluding that the particular facts of the offense make it unsafe, at that time,

2  to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re

3  Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he

4  nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole"

5  but might violate due process "where no circumstances of the offense reasonably could be

6  considered more aggravated or violent than the minimum necessary to sustain a conviction

7  for that offense").

8  C.    The Governor's Decision Was Not Supported By Some Evidence

9      The Governor identified several factors supporting his decision to reverse the BPT

10  decision and find Thomas unsuitable for parole, i.e., the circumstances of the offense,

11  Thomas' failure to accept responsibility, his need for further programming and his pre-

12  offense history.

13      The Marin County Superior Court upheld the decision. See Exh. AA to Resp. Exh. 8.

14  That court determined that some evidence did support the decision, although that court had

15  reservations about it. See id. at 2-4. The Marin court identified the some evidence standard

16  as the proper standard for judicial review of evidentiary sufficiency for parole denial cases.

17  Although that court discussed the law, it did not mention the evidence it relied upon in

18  reaching its conclusion that there was some evidence to support the Governor's decision. The

19  California Court of Appeal and California Supreme Court denied the petitions without

20  comment. This court therefore independently will review the record in order to determine

21  whether the Marin County Superior Court's findings were objectively unreasonable under 28

22  U.S.C. § 2254(d). See Greene v. Lambert, 288 F.3d 1081, 1088-89 (9th Cir. 2002).

23      1.    Commitment Offense

24      The Governor's decision described the facts of the crime, as taken from the probation

25  officer's report:

26      According to the probation officer's report, at approximately 7:30 p.m. on October 6,
    1979, Jerome Thomas's grandfather hosted a party for some friends. Jessie Ross, 63
27  years old, was a family friend and guest at the party. Mr. Thomas, age 26, accused
    Mr. Ross of making advances towards Mr. Thomas's girlfriend, Chanelle Pierce. Both
28  men had been drinking, and a loud argument ensued. Mr. Thomas and Ms. Pierce left

1    the party.

2       Mr. Ross stayed and began to play dice with Mr. Thomas's grandfather.
        Approximately 15 minutes later Mr. Thomas returned armed with a gun.  Without
3       speaking, Mr. Thomas fired six bullets into Mr. Ross from approximately three feet
        away, and then left.  Mr. Ross was pronounced dead at the scene.  [¶]  Mr. Thomas
4       surrendered to police two days later.

5    Resp. Exh. 5 at 1.  This recitation of the facts is an incorrect summation of the probation

6    officer's report in two minor ways:  (1) the probation officer's report stated that Jerome

7    Thomas' grandfather and the victim were drinking, but did not state that Jerome Thomas was

8    drinking and (2) the probation officer's report stated that the victim was 53, not 63, years old.

9    See Resp. Exh. 6, p. 5.  These discrepancies are not identified just to nit-pick: an alcohol-

10   induced shooting would suggest a possibility of a substance abuse problem and adding ten

11   years to the victim's age would suggest a more vulnerable victim.

12       A circumstance tending to indicate unsuitability for parole is that "the prisoner

13   committed the offense in an especially heinous, atrocious or cruel manner."  15 Cal. Code

14   Regs. § 2402(c)(1).  The factors to be considered in determining whether that circumstance

15   exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate

16   and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled

17   or mutilated during or after the offense," "[t]he offense was carried out in a manner which

18   demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for

19   the crime is inexplicable or very trivial in relation to the offense."  15 Cal. Code Regs. §

20   2402(c)(1).

21       The Governor's consideration of the commitment offense was certainly permissible,

22   but his decision is worded in such a way that one cannot determine that he actually adhered

23   to the regulation.  Specifically, he did not articulate the standard and did not articulate that

24   Thomas committed the offense "in an especially heinous, atrocious or cruel manner."  The

25   Governor did mention that Thomas' "motive was extremely trivial" in relation to the act of

26   killing in that Thomas killed the victim after the victim had made a pass at his girlfriend.

27   That factor was well-supported by the record.  The triviality of the motive is a factor tending

28   to support a determination that the offense was committed in an especially heinous, atrocious

or cruel manner but is not synonymous with it.  See 15 Cal. Code Regs. § 2402(C)(1)(E).

The Governor also found Thomas' "disregard for the life and suffering of others particularly callous;" that "[t]here was great potential for serious injury to others, as there were approximately five to seven people in the house at the time of the shooting.  In fact, Mr. Thomas's grandfather was just a few feet from Mr. Ross."  Resp. Exh. 5, p. 2.  The problem with this is that the Governor appeared to substitute potential for actual disregard for life and suffering of others, and that was not one of the listed factors tending to show the offense was committed in an especially heinous, atrocious or cruel manner.  See 15 Cal. Code Regs. § 2402(C)(1)(D).  The regulation guides the Governor's review of the case, and the Governor's decision did not adhere to the regulation.  There was not some evidence to show that the murder was committed in an especially heinous, atrocious or cruel manner such as to show present unsuitability for parole.

The Governor's determination that the manner of the killing demonstrated "an extreme level of anger and lack of control, and a degree of premeditation" was well-supported by the record.  Resp. Exh. 5.  Thomas had a cooling down period between any provocation and the killing:  he left the party after the initial argument and returned fifteen minutes later to kill the victim.  As discussed below, the anger and lack of control problems have been addressed by Thomas in prison.  Although there was evidence of premeditation as the Governor mentioned, the jury had convicted Thomas of second degree murder and not first degree murder.  Additionally, Thomas' actions in returning to kill the victim after the initial argument ended is the kind of immutable event that Biggs cautioned against relying on in perpetuity to deny parole for present dangerousness.  Thomas' exemplary behavior in prison plus his efforts to work on anger management plus his favorable current psychological reports reduce the predictive value of this fact 20 years after the killing.

2.    Need To Take Responsibility For The Crime

The Governor also determined that Thomas had failed to accept responsibility for the crime.  The Governor wrote:  "Since the time of his arrest, Mr. Thomas has asserted that Mr. Ross threatened him with a gun during their initial confrontation.  However the police

1  investigation confirmed that Mr. Ross was not armed and was defenseless when gunned

2  down.  The fact that Mr. Thomas continues this assertion demonstrates that he has failed to

3  fully accept responsibility for his actions."  Resp. Exh. 5, p. 2.

4        The Governor's reliance on this circumstance is not supported by some evidence.  The

5  two scenarios are not necessarily inconsistent:  the victim may have had a gun when he and

6  Thomas first argued and not have had that gun when he was killed fifteen minutes later when

7  Thomas returned to the party and shot him in a different room.  Thomas did not claim that

8  the victim was armed when he killed him; the police confirmed that fact, i.e., the victim was

9  unarmed when killed.  Thus, Thomas' statement that the victim was armed earlier does not

10 support a finding of a failure to accept responsibility for his actions, absent evidence in the

11 record that the victim was not armed at either time.  The record does not indicate that

12 Thomas was attempting to blame the victim for the shooting itself:  Thomas acknowledged

13 that the had left the party with his girlfriend and drove back 15 minutes later to confront the

14 victim.  The BPT panel and the psychologist who evaluated Thomas concluded that he had

15 accepted responsibility and was very remorseful.  See Exh. F to Resp. Exh. 8 (BPT 10/18/02

16 reporter's transcript) (hereinafter "RT") at 7-8; 39; Exh. H to Resp. Exh. 8.  The transcript of

17 the parole hearing reflects an acceptance of responsibility and an understanding of the impact

18 that the killing had on the victim's family as well as on Thomas' own family.  There was not

19 some evidence to support the Governor's determination that Thomas had failed to fully

20 accept responsibility for killing Ross.

21       3.    Need For More Programming To Address The Cause Of The Murder

22       The Governor determined that Thomas needed more time to work on anger

23 management and to "more fully address the causative factors of his crime."  Resp. Exh. 5 at

24 2.  The Governor wrote:

25       Although Mr. Thomas's recent evaluations have been positive, his initial evaluation
         found that he responds to situations with exaggerated anger and becomes vindictive
26       and revengeful.  His 1991 evaluation found his prospects for successful parole were
         "guarded."  Despite these assessments, Mr. Thomas's participation in anger
27       management programs has been limited.  I believe he requires further incarceration in
         order to more fully address the causative factors of his crime.
28

11

1  Id.

2          The Governor's finding on this point was contrary to the evidence in the record and

3  arbitrary.  First, the record does not indicate multiple episodes of exaggerated anger, contrary

4  to the Governor's intimation that over-reacting was a repeated behavior.  Second, the

5  Governor overlooked the evidence that Thomas had participated in a 10-week anger

6  management course.  See RT 19.[2]  Third, the Governor's reliance on a 1991 evaluation was

7  irrational because he inexplicably ignored a much more current psychological evaluation in

8  the record.  The Governor did not indicate that he considered the 2002 evaluation, that he

9  found any problems in it or that he rejected it; instead, he simply ignored it.  When deciding

10  whether an inmate poses a danger if paroled in 2002, reliance on a 1991 psychological

11  evaluation when a 2002 psychological evaluation is available and not flawed in any

12  identified way supports an inference that the decision was arbitrary and the outcome pre-

13  determined.

14          The 2002 psychological evaluation was very favorable, as the BPT panel noted in

15  finding Thomas suitable for parole.  See RT 39-43; Exh. H to Resp. Exh. 8.  The 2002

16  psychological report indicated that Thomas' understanding of his behavior had evolved and

17  improved over the years in custody.  See Exh. H to Resp. Exh. 8.  While a psychologist had

18  determined that Thomas' risk for violence in the community was "unpredictable" in 1991, he

19  was considered a low risk for violence by 2002.  The psychologist concluded in 2002:

20          Overall, Mr. Thomas appears to have a low risk for violence in the community.  He is
21          not criminally oriented and he is not normally prone to violence. The index offense
            appears to have been an isolated incident of affective violence, with Mr. Thomas
22          exhibiting impulsive rage and poor judgment in response to a stressful interpersonal
            encounter.  Through his participation in self-help groups, he seems to have gained
23          some insight into the dynamic factors that contributed to the crime and he seems more
            willing to explore these issues.  His previous defensiveness appears to have been self-
24          protective, with Mr. Thomas attempting to avoid the painful recognition that despite
            his prosocial orientation, he had killed another human being in a fit of rage.  He now
25          seems able to control his angry impulses and to deal with them in more constructive
            ways.  This is evidenced by his remarkable ability to avoid CDC-115's during his long
26          incarceration in prison.

27  Exh. H to Resp. Exh. 8, pp. 4-5.  Although there is no hard and fast rule that a decision-

28  maker must accept the most current psychological evaluation, ignoring it without explanation

12

in favor of reliance on a decade-old report smacks of arbitrariness.  The Governor cannot have it both ways: if he wants to say an inmate needs to work on anger management, he cannot ignore it when the inmate works on anger management.  There was not some evidence to support the Governor's determination that Thomas needed further programming to work on anger management or the causative factors for the killing.

4.    <u>Prior History</u>

The Governor placed only slight reliance on Thomas' prior criminality and substance abuse, but even that appears to overstate the case.  The Governor noted that Thomas had pled guilty to carrying a concealed weapon.  The Governor did not note that the charge was a misdemeanor, that the conviction occurred four years before the killing, that Thomas had been sentenced to one year of probation (which he successfully completed), that this one conviction was Thomas' only conviction and that he had no juvenile record.  The BPT had described Thomas' criminal history as "very negligible," in that it consisted of no juvenile record at all and a single misdemeanor conviction as an adult.  RT 9; <u>see</u> RT 38 ("he lacks a significant criminal history of violent crime"); Resp. Exh. 6, p. 5 (conviction was for a misdemeanor).

The Governor wrote that Thomas "has also admitted using an illegal drug on a regular basis during a period of his life."  Resp. Exh. 5, p. 2.  This deliberately vague statement appears to be a reference to a psychologist's report that showed that Thomas "readily admitted to occasionally smoking marijuana as a youth, and only moderately ingesting alcohol, and alcohol and drugs had not been an issue at all during his entire incarceration."  RT 42.  There was no evidence that he used marijuana as an adult before the murder (which was committed when he was 26 years old) or at any time during his incarceration.

Although the Governor's statements are not actually incorrect, the probative value of occasional use of marijuana while a minor and a single misdemeanor conviction for a non-violent offense -- when viewed in the context of other extremely positive behavior -- as predictors of current suitability for parole for a 49-year old are virtually nil.

D.      Thomas' Other Circumstances

Although the Governor thought the negative factors discussed above outweighed the positive factors for Thomas, even the Governor noted that Thomas had "made commendable gains during his time in prison.  He has received satisfactory to exceptional performance ratings in his work assignments and has received no disciplinary reports.  Mr. Thomas has been heavily involved in self-help programs, including various veterans' groups and the SQUIRES program, which helps redirect juveniles away from crime."  Resp. Exh. 5, p. 1. The BPT elaborated on Thomas' in-prison behavior at the hearing.  Thomas had participated in the "Cat T" and "Cat X" programs; had been involved in the Veteran's Group, the Veterans' Issues Group, Squires, the Speak Easy Gavel Club, Toastmasters, the Catargio Group; and continued to be active in those groups.  RT 38.  The BPT also was very impressed by the complete lack of disciplinary reports for the 17 years Thomas had been incarcerated.   The BPT concluded that "[w]hile imprisoned he has enhanced his ability to function within the law upon release through his participation in self-help and therapy, vocational programs, institutional job assignments and volunteerism."  RT 37-38.

The BPT determined that Thomas was remorseful:

> He shows signs of remorse.  he has indicated that he understands the nature and the magnitude of the offense, and he accepts responsibility for the criminal behavior and has a desire to change toward good citizenship.  In fact, I would say that his desire to change towards good citizenship began when he was first incarcerated, as he has never presented himself as a problem to the community within the prison setting.  And the other – the other reasons bearing upon suitability is that the inmate has a great understanding of the impact on not only the victim's family, but his own family and friends in committing this crime.

RT 39.  The BPT noted that the psychological reports supported this view, as well as that Thomas presented no need for mental health services.  RT 39-40.  The psychological reports were favorable for release and was considered to have a low risk for violence in the community.  "He is not criminally oriented, and he is not normally prone to violence.  The index offense appears to have been an isolated incident of effective violence" and "impulsive rage."  RT 40, quoting 2/21/02 psychological report.  The psychologist opined that Thomas "now seems able to control his angry impulses and to deal with them in more constructive

14

ways.  This is evidenced by his remarkable ability to avoid CDC 115's during his long incarcerated period.'"  RT 41, quoting 2/21/02 psychological report.  The BPT additionally noted a favorable psychological report from Dr. Jeko in July 2001 that discussed Thomas' maturation in prison.  RT 42-43.

The BPT also saw a positive future for Thomas:  "Because of maturation, growth, greater understanding and advanced age, he has reduced his probability of recidivism.  He has very realistic parole plans which include a job offer, family support and a place to live. He has maintained close family ties while imprisoned via letters and visits, and he has maintained positive institutional behavior, which indicates significant improvement in self-control."  RT 38.  Thomas had letters of support that indicated he had employment opportunities and housing available upon parole.  RT 24-26.   Thomas also had a worsening health problem in that he was losing his eyesight due to glaucoma.  RT 3; Resp. Exh. 7, p. 2.

E.      Thomas Is Entitled To Relief

Thomas had first been considered for parole in 1990 and was found not suitable at the ten subsequent parole consideration hearings thereafter.  See RT 6, 27.  He was finally found suitable for parole at the October 18, 2002 BPT hearing, after he had been in custody for 20 years on his 17-to-life sentence.  The Governor looked at the same evidence as the BPT and reached the opposite conclusion.

This case is just the sort of case Biggs envisioned, where the commitment offense is repeatedly relied on to deny parole notwithstanding the prisoner's exemplary behavior and evidence of rehabilitation since the commitment offense.[3]  The murder here, while terrible, was not notably worse than other second degree murders.  And the crime was aberrant behavior rather than part of continuing criminality.  In light of the extensive evidence of Thomas' in-prison rehabilitation and exemplary behavior, the reliance on the unchanging factor of the murder to deny Thomas parole for the tenth time and 20 years into his 17-to-life sentence violated his right to due process.  The some evidence standard provides more protection than against fabricated charges or bureaucratic mistakes -- the some evidence standard also protects against arbitrary decisions.  See Superintendent v. Hill, 472 U.S. at

15

454-55, 457.  The Governor's decision was arbitrary and therefore did not comport with the some evidence standard.  The state court's unexplained conclusion that there was some evidence to support the Governor's decision was an unreasonable application of Superintendent v. Hill.  The state court's approval without discussion of the Governor's decision -- a decision that, as mentioned in this order, had several details of the crime wrong, incorrectly stated that Thomas had not accepted responsibility for the crime, ignored current psychological evaluations in favor of an outdated one, and overstated the extent of Thomas' pre-offense misbehavior – unreasonably applied the some evidence standard.  Thomas is entitled to relief under the standard of 28 U.S.C. § 2254(d).

Having decided that the petition should be granted, the next question concerns the proper remedy.  Once the BPT determined that Thomas was suitable for parole, it calculated his term and assessed a total term of confinement of 228 months, less post-conviction credits of 83 months, for a total period of confinement of 12.1 years, and that Thomas was already past his release date.  RT 44.  The significance of this calculation is that, because the Governor's decision was not supported by some evidence, this court need not send the matter back to the BPT to set a term for Thomas because the BPT has already done so.  Thomas is entitled to release and he is past his release date.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is granted.  Respondent must release Jerome Thomas from custody within **ten days** of the date of this order.  Within **twenty days** of the date of this order, respondent must also file a notice with the court confirming the date on which Thomas was released.

IT IS SO ORDERED.

DATED:   December 21, 2006

_____
Marilyn Hall Patel
United States District Judge

16

1

2                                          **NOTES**

3

4      1.       The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the
commitment offense, i.e., whether the prisoner committed the offense in "an especially
5      heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the
prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual
6      offense, the prisoner has a lengthy history of severe mental problems related to the offense;
and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances
7      tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social
history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered
8      from battered woman's syndrome, lack of criminal history, the present age reduces the
probability of recidivism, the prisoner has made realistic plans for release or developed
9      marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).

10     2.       A prison readjustment counseling therapist wrote on February 14, 2001 that Thomas
"completed a 10 week course dealing with Anger Management presented by the United States
11     Department of Veteran's Affairs, North B Veteran's Center.  The session delved into all aspects  of
anger resulting in frank discussions, thought, which veteran Thomas participated in fully.  His
12     enthusiastic input enhanced the session as well as stimulated participation by others.  . . . Veteran
Thomas should be commended for his personal commitment to the success of this program."  RT 19-
13     20.

14     3.       Respondent's suggestion that there was not repeated reliance on the same facts because
this was the first time the Governor (rather than the BPT) relied on it to deny parole is unpersuasive,
15     as it would allow the various parole authorities to take turns relying on the same evidence with none
being said to have relied on it repeatedly.  Regardless of who makes the decision, the result is the
16     same for the prisoner in that parole is denied repeatedly.

17

18

19

20

21

22

23

24

25

26

27

28

                                             17